PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

M. PAM DAVIS,

  *Plaintiff-Appellant,*

v.

UNIVERSITY OF NORTH CAROLINA, at
Wilmington; ROBERT E. TYNDALL,
Ph.D.,

  *Defendants-Appellees.*

No. 99-1888

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-97-1025-5-1-BR)

Argued: June 4, 2001

Decided: August 20, 2001

Before WIDENER, TRAXLER, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Traxler wrote the opinion, in
which Judge Widener and Judge Gregory joined.

## COUNSEL

**ARGUED:** David Alan Vesel, DAVID A. VESEL, P.A., Raleigh,
North Carolina, for Appellant. Joyce S. Rutledge, Assistant Attorney
General, NORTH CAROLINA DEPARTMENT OF JUSTICE,
Raleigh, North Carolina, for Appellees. **ON BRIEF:** Michael F. Eas-
ley, Attorney General of North Carolina, NORTH CAROLINA

DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

## OPINION

TRAXLER, Circuit Judge:

Pam Davis, a student at the Wilmington branch of the University of North Carolina ("UNC-W"), brought an action alleging that UNC-W violated the Americans with Disabilities Act and the Rehabilitation Act of 1973 when it removed her from a teacher's certification program. The district court granted summary judgment in favor of UNC-W, and Davis appeals. We affirm.

### I.

Davis was diagnosed in 1993 as suffering from dissociative identity disorder ("DID"), also known as multiple personality disorder. She has seventeen distinct personalities, including Michael 1, Michael 2, and Michael 3. Although Davis receives Social Security disability benefits as a result of her disorder, her disorder has not prevented her from succeeding in the academic arena. Davis earned a bachelor of science degree from Barton College in 1994, and she met UNC-W's academic eligibility requirements for participation in a sixty credit-hour undergraduate teacher certification program. Davis initially enrolled in the certification program solely to satisfy the prerequisites for the master's degree program that she hoped to enter; she did not intend to pursue teaching as a career.

Davis began attending UNC-W in January 1997 and quickly started experiencing some problems. A professor was convinced that Davis plagiarized from various professional journals for an assignment. After discussing the issue with Davis, the professor permitted her to re-do the assignment. Thereafter, the Dean of UNC-W's School of Education became concerned upon learning that Davis was distributing a business card that seemed to indicate that she had already received the master's degree, even though she had not even completed the certification program. Davis compounded the problem by

misrepresenting to the Dean the number of people to whom she had given the card and attempting to pass it off as a joke.

In addition, professors were becoming concerned about Davis's inappropriate and sometimes aggressive behavior towards them. For example, Davis approached Professor Lanunziata after a class, accusing him of "slighting" her during a class discussion and demanding to know how he would redress the problem. Just over a week later, Davis challenged Lanunziata in class, stating that she was "appalled" by a statement he had made and aggressively disagreeing with his views on an issue. Professors also learned about various incidents of aggressive behavior involving Davis and other students, including an incident where Davis "fl[ew] into a fit of rage during a group project, . . . scattering books or papers on the floor."[1] J.A. 238.

On June 27, Davis was preparing to take the final examination in Professor Lanunziata's class. Davis went to Lanunziata's office to pick up the exam, and he took her through a hallway into the classroom. She returned to his office a few minutes later obviously shaken and crying, saying that she could not find Michael and that she could not take the test without Michael. Another professor took Davis to the campus counseling center, where Davis met with a therapist. Davis regained her composure sufficiently to take the final examination (and one for another class) that day, and she spoke to Lanunziata about the incident later that afternoon. Davis describes the incident as an "abreaction" triggered by a childhood memory which caused a different personality to emerge.

UNC-W officials met with Davis on June 30 and informed her that

---

[1]Although there is no dispute as to the general occurrence of these incidents, Davis disagrees with UNC-W's version of the incidents. As will become clear, however, these factual disputes are not material and do not prevent the granting of summary judgment. *See Plett v. United States*, 185 F.3d 216, 223 (4th Cir. 1999) ("Summary judgment does not become disfavored simply because . . . there are *some* disputed facts. The essential question presented on a motion for summary judgment remains whether, in the absence of a genuine dispute over *material* facts, the moving party is entitled to judgment as a matter of law." (citation and internal quotation marks omitted)).

they were removing her from two education classes for which she was registered in the upcoming summer session. By the middle of August, UNC-W had removed Davis from the certification program entirely. There is no dispute that Davis informed UNC-W officials at the June 30 meeting that she suffered from DID. Although Professor Lanunziata disagrees, Davis contends that she told him about her disorder at the end of May and again after the final exam incident.

UNC-W's explanation for removing Davis from the program was that she failed to meet the school's non-academic requirements as set forth in the "Performance Review Process" portion of its procedures manual. These non-academic requirements set forth standards of "Professional Behavior" that students are expected to meet, including "professional demeanor; professional interactions with university students, faculty, staff, and administrators; . . . and adherence to school rules and ethical standards." J.A. 32. In light of the plagiarism, the business card incident, and Davis's aggressive manner with students and professors, UNC-W believed that Davis failed to exhibit the honesty and professional demeanor required of its students.

In addition, there is evidence in the record from which a jury could conclude that UNC-W's action was motivated at least in part by its apprehension about whether Davis should work with children. Davis admitted to school officials that she occasionally suffered from memory blackouts because of her disorder, a fact that caused UNC-W some concern because completion of the certification program required one-on-one contact with young children.

After removing Davis from the certification program, UNC-W offered to waive the certification requirement and allow Davis to apply to the master's program, but Davis never applied. Although she had in the past told school officials that she did not want to teach, Davis believed that she met the requirements for the certification program and she believed that she was entitled to complete it. UNC-W administratively enrolled her in other classes that were appropriate for the master's degree she initially wanted, but Davis did not stay in the classes, nor did she enroll in any other classes, even though she was free to do so.

Davis then brought this action, alleging that UNC-W removed her from the certification program because of her DID. UNC-W, how-

ever, contends that it removed her from the program not because she suffers from DID but because, given the problems she had at school, she did not meet the non-academic standards necessary to continue in the program. After referring the case to a magistrate judge for a report and recommendation, the district court granted summary judgment in favor of UNC-W, concluding that Davis failed to raise a genuine issue of material fact as to whether she was disabled and as to whether she was qualified for the certification program.

## II.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132 (West 1995). Such discrimination is similarly proscribed by the Rehabilitation Act. *See* 29 U.S.C.A. § 794(a) (West Supp. 2001) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ."); *id.* § 794(b)(2)(A) (West 1999) (defining "program or activity" as including all operations of "a college, university, or other postsecondary institution"). Thus, to state a claim under the Rehabilitation Act or Title II of the ADA, Davis must establish that: (1) she has a disability as defined by the acts; (2) she is otherwise qualified for the benefit or program at issue; and (3) she was excluded from the benefit or program on the basis of her disability. *See Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999); *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000). Although the ADA and the Rehabilitation Act have different causation standards, the language of the acts otherwise is similar. *See Baird*, 192 F.3d at 468-69. And because causation is not an issue in our disposition of this case, we will consider together Davis's claims under the ADA and the Rehabilitation Act. *See id.*; *see also Bragdon v. Abbott*, 524 U.S. 624, 632 (1998) (noting that Congress has directed courts "to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act.").

For purposes of this opinion, we will assume that Davis is "otherwise qualified" and that UNC-W removed her from the certification program because of her DID.[2] The dispositive question, then, is whether Davis is disabled within the meaning of the statutes.

An individual is disabled under the ADA or the Rehabilitation Act if he or she: (1) has a physical or mental impairment that substantially limits one or more of the individual's major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *See* 42 U.S.C.A. § 12102(2) (1995); 29 U.S.C.A. § 705(20)(B) (West 1999 & Supp. 2001). On appeal, Davis does not argue that she is in fact disabled by her disorder, but instead proceeds under the theory that UNC-W regarded her as being disabled. Davis contends that her evidence created a question of fact as to whether UNC-W perceived her as unable to work by virtue of her disorder. *See* 28 C.F.R. § 35.104 (2000) (ADA regulation defining "major life activities" as including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"); 34 C.F.R. § 104.3(j)(2)(ii) (2000) (Rehabilitation Act regulation similarly defining "major life activities"); 45 C.F.R. § 84.3(j)(2)(ii) (2000) (same). Davis therefore contends that the district court erred by granting summary judgment. We disagree.

The only evidence of UNC-W's perception of Davis's disability is Dean Tyndall's statement in his deposition that he believed Davis was, "in a general sense," disabled by her disorder, J.A. 311, and the questions raised by UNC-W officials about her fitness to work with children, particularly in light of her occasional blackouts. Viewed in the light most favorable to Davis, this evidence perhaps indicates that UNC-W perceived Davis to be limited in her ability to work. It does not, however, demonstrate that UNC-W perceived Davis to be *substantially* limited. *See Murphy v. United Parcel Servs.*, 527 U.S. 516, 521-22 (1999) ("[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment *substantially limits* one or more

---

[2]These assumptions render immaterial any factual questions about the details of the incidents leading up to Davis's removal from the certification program, when UNC-W learned of Davis's disorder, and why it removed her from the certification program.

major life activities.") (emphasis added); *see also* 28 C.F.R. § 35.104; 34 C.F.R. § 104.3(j)(2)(iv)(A); 45 C.F.R. § 84.3(j)(2)(iv)(A).

"When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999); *cf.* 29 C.F.R. § 1630.2(j)(3)(i) (2000) ("The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.").[3]

At most, Davis's evidence establishes that she was perceived as unable to perform a single job—teaching, or perhaps a very narrow range of jobs—those that require unsupervised contact with children. Because a number of jobs in the education field and other fields requiring similar skills and training remain open to Davis even with this perceived limitation, we cannot say that UNC-W perceived Davis to be unable to perform a class of jobs. *See Sutton*, 527 U.S. at 492 ("If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs."); *cf.* 29 C.F.R. § 1630.2(j)(3)(ii)(B) (defining "class of jobs" as including "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities"). And given the innumerable jobs available that do not require unsupervised contact with children, we cannot say that UNC-W perceived Davis to be unable to perform a broad range of jobs. *See Sutton*, 527 U.S. at 492

---

[3]These regulations, issued by the EEOC under Title I of the ADA (which prohibits employment discrimination), may not be directly applicable here since the EEOC is not charged with enforcing Title II of the ADA and this case does not arise in the employment context. However, we find the regulations helpful, even if only by way of analogy. *See McGuinness v. University of New Mexico Sch. of Med.*, 170 F.3d 974, 978 (10th Cir. 1998) (applying principles from ADA employment discrimination cases by analogy to student's ADA claim against a medical school).

("[I]f a host of different types of jobs are available, one is not pre-cluded from a broad range of jobs."); *cf.* 29 C.F.R. § 1630.2(j)(3)(ii)(C) (defining "broad range of jobs" as including "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities"). While teaching chil-dren (or at least obtaining her certification) may now be of prime importance to Davis, that fact is largely unimportant to our analysis, because neither the ADA nor the Rehabilitation Act protects "every dream or desire that a person might have." *Knapp v. Northwestern Univ.*, 101 F.3d 473, 481 (7th Cir. 1996).

Although the evidence forecast by Davis may show that UNC-W perceived Davis to be somewhat limited in her ability to work, Davis's evidence fails to establish that UNC-W regarded her as being substantially limited in her ability to work. *See Sutton*, 527 U.S. at 492 ("To be substantially limited in the major life activity of working, . . . one must be precluded from more than one type of job, a special-ized job, or a *particular job of choice*." (emphasis added)); *McGuin-ness*, 170 F.3d at 979 ("For the purposes of the ADA, inability to pursue one career, such as medicine, does not constitute a severe impact on an individual's life."); *Daley v. Koch*, 892 F.2d 212, 215 (2d Cir. 1989) (noting that under the Rehabilitation Act, "[b]eing declared unsuitable for the particular position of police officer is not a substantial limitation of a major life activity"). Davis has therefore failed to establish that UNC-W regarded her as being disabled within the meaning of the relevant statutes.[4]

---

[4]At oral argument, counsel for Davis suggested that UNC-W perceived Davis as being so unable to get along with others that she was substan-tially limited in her ability to work. This argument approaches a claim that the ability to get along with others is a major life activity, a claim about which we have some doubt. *See Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir. 1997) (suggesting that getting along with others is not a major life activity). *But see McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999) ("Because interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of 'major life activity.'"), *cert. denied*, 530 U.S. 1243 (2000). However, we need not consider the argument because Davis did not make it in her brief, nor is there any indication in the

To the extent that the major life activity that we should be considering is some narrow subset of the major life activity of learning, such as attending college (which, for purposes of this opinion, we will assume qualifies as a major life activity), our conclusion remains the same. The evidence presented by Davis falls well short of establishing that UNC-W perceived her to be substantially limited in that regard. At best, her evidence shows that UNC-W perceived her to be unable to complete one specific program—the teacher certification program. There is no evidence that UNC-W believed her to be unable to complete other programs it offered. In fact, the only evidence in the record is to the contrary: UNC-W was willing to waive the certification requirement and allow Davis to apply to the master's degree program without being certified and without completing the additional forty or so credit hours that would be required for Davis to finish the certification program. UNC-W did not prohibit Davis from attending classes (and in fact enrolled her in other education classes), but simply determined that she was not suitable for the one particular program that she now insists on completing. *See Sutton*, 527 U.S. at 490-91 (explaining that under the ADA, a covered entity "is free to decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job"); *McGuinness*, 170 F.3d at 977, 978 (rejecting ADA claim by medical school student with an "'anxiety disorder' that manifests itself when he takes chemistry and mathematics tests" because the student failed to establish that his impairment "impedes his performance in a wide variety of disciplines"); *Knapp*, 101 F.3d at 482 ("The Rehabilitation Act does not guarantee an individual the exact educational experience that he may desire, just a fair one."). Thus, Davis failed to present evidence establishing that UNC-W regarded her as being *substantially* limited in her ability to learn.

---

record that she made a similar argument below. *See Washington Metro. Area Transit Auth. v. Precision Small Engines*, 227 F.3d 224, 228 (4th Cir. 2000) (per curiam) ("[T]he general rule is that this Court will not consider issues raised for the first time on appeal."). Even if we were to consider the argument, we would find that the evidence forecast by Davis again falls short. While the evidence in the record establishes that some (but not all) UNC-W professors and officials had personal difficulties with Davis, there is simply no evidence in the record from which it could be inferred that UNC-W perceived Davis to be so deficient in her interpersonal skills that she would be unable to work.

## III.

Cases questioning academic decisions made by colleges and universities are always difficult, requiring a court to carefully balance the rights of students against the school's "legitimate interests . . . in preserving the integrity of [its] programs." *Alexander v. Choate*, 469 U.S. 287, 300 (1985). And because "[c]ourts are particularly ill-equipped to evaluate academic performance," *Board of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 92 (1978), we generally accord great deference to a school's determination of the qualifications of a hopeful student, *see Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment."); *accord Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1047 (9th Cir. 1999); *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25 (1st Cir. 1991). In this case, however, we are not required to determine the deference to which UNC-W's decisions might be entitled, because Davis has failed to make a prima facie showing that she is disabled within the meaning of the ADA or the Rehabilitation Act by failing to present any evidence from which it could be inferred that UNC-W regarded her as being substantially limited in any major life activity.[5] Accordingly, the district court's order granting summary judgment in favor UNC-W is affirmed.

*AFFIRMED*

---

[5]This conclusion makes it unnecessary to consider Davis's argument that the district court erred by applying a "pretext plus" standard to her claims. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) (rejecting the "pretext plus" standard).