Tess ROHAN, Plaintiff

v.

NETWORKS PRESENTATION
LLC, Defendant

No. JFM–01–CV–1749.

United States District Court,
D. Maryland.

Dec. 3, 2001.

Jonathan C. Dailey, Dailey and Associates Chtd, Washington, DC, Peter Cohen, Rockville, MD, for plaintiff.

Bruce L. Marcus, Marcus and Bonsib, Greenbelt, MD, for defendant.

*MEMORANDUM*

MOTZ, District Judge.

Plaintiff Tess Rohan, an actress with a touring theater company, has brought an action for employment discrimination under the Americans with Disabilities Act ("ADA," or "the Act"), 42 U.S.C. § 12101 *et seq.*, adding related common law tort and contract claims. Defendant Networks Presentation LLC ("Networks") has moved to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the motion will be granted as to two of the ADA claims, failure to accommodate and breach of confidentiality, but denied as to the ADA claim of wrongful discharge and as to the two common law claims.

## I.

Rohan appeared in a touring production of "Jekyll & Hyde" until she was fired on December 6, 2000. (Compl.¶¶ 44, 97–98.) On January 2, 2001, Rohan filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that the owner of the theater company, Networks, had discriminated against her on the basis of her sex and disability. (Def.'s Mem.App. 1.) The EEOC investigated and concluded that Rohan's claim lacked merit. It issued a right to sue letter to her on March 19, 2001. (*Id.* App. 2.)

Rohan states that she suffers from mental disabilities stemming from past incest and sexual abuse by her father. (Compl.¶¶ 53–54.) Specifically, Rohan claims she suffers from Post Traumatic Stress Disorder (PTSD), depression, dissociation, and abreactions. (*Id.* ¶ 53.)[1] Her mental disabilities, Rohan claims, caused her to suffer flashbacks that "visibly affected [her] outward behavior and demeanor." (*Id.* ¶¶ 70–71.) Additionally, she felt depressed and socially withdrawn, suffered sleep disturbances, and had difficulty interacting with people, particularly with men who reminded her of her father and with people who expressed anger by raising their voices or yelling, actions which could trigger Rohan's symptoms. (*Id.* ¶¶ 80, 85, 88–90.)

Several of Defendant's managers knew about Plaintiff's disabilities. Prior to being hired by Networks, Plaintiff told Patricia Gentry, Networks' vice president and secretary, "the nature of her mental impairment, what it stemmed from, and the facts that she was taking medication and receiving professional help for her condition." (*Id.* ¶¶ 20, 154.) After she was hired, Plaintiff provided the same information to Gretchen Pfamer, Networks' company manager for the "Jekyll & Hyde" production, and to unidentified "others in management." (*Id.* ¶¶ 63, 155.)

On September 13, 2000, after having suffered an unspecified "episode[ ]" during a rehearsal, Rohan claims that Pfamer told her she had to inform her fellow cast members about her disabilities. (Pl.'s Opp'n at 4–5.) According to Rohan, Pfamer told her "that the entire company needed to know everything (meaning my disability). She told me either I could say something during the company orientation or that they (management) would do it. People had complained about not knowing and felt they had a right to know" (emphasis omitted). (*Id.*) Rohan states that she was called to the front of a theater in Charleston, South Carolina, and forced to

---

1. A glossary Rohan provided to the EEOC defines "dissociation" as "[a] disruption in the usually integrated functions of a consciousness, memory, identity, or perception of the environment." (Pl.'s Opp'n at 6.)

"Abreactions" are defined as "emotional release[s] or discharge[s] after recalling a painful experience that has been repressed because it was not consciously tolerable." (*Id.*)

reveal to at least 30 fellow cast members that she was an "incest survivor" and suffered from the disorders listed above. (*Id.* at 5; *see also* Compl. ¶¶ 124–131.)

Rohan's EEOC complaint mentions the September 13 incident as well as sexual harassment as motivating her grievances. (Def.'s Mem.App. 1.) In her suit, however, Rohan does not pursue the allegations of sexual harassment. Instead, she pleads five counts three under the ADA, for wrongful discharge, failure to accommodate, and violation of confidentiality; a common law tort claim for invasion of privacy, stemming from the September 13 incident; and a common law claim for breach of contract.

## II.

Networks challenges the ADA claims on the ground that Rohan failed to assert them in the charge she filed with the EEOC. Defendant's argument has merit only with regard to Plaintiff's failure to accommodate claim.

## A.

Before addressing the merits of Defendant's motion, I first consider a procedural point. Defendant's Motion to Dismiss Counts I, II, and III on the ground that they have not been administratively exhausted requires me to consider documents extrinsic to the pleadings notably, Plaintiff's EEOC charge of discrimination

(Def.'s Mem.App. 1; Pl.'s Opp'n App. 4), the ADA form Plaintiff completed at the EEOC in conjunction with her charge of discrimination (Pl.'s Opp'n App. 2), and a supplementary 17–page statement Plaintiff provided to EEOC investigators (Pl.'s Opp'n App. 5).[2] Because I am considering these extrinsic documents, I must convert Defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) to a Motion for Summary Judgment under Federal Rule of Civil Procedure 56. *See Laughlin v. Metro., Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir.1998); *see also Lane v. Wal–Mart Stores East, Inc.*, 69 F.Supp.2d 749, 750, 756 (D.Md. 1999) (converting motion to dismiss to motion for summary judgment in employment discrimination case so as to consider such "relevant documentation" as an ADA information form).[3] However, because the focus of the extrinsic documents Plaintiff submitted is administrative exhaustion, I convert the Motion to Dismiss to a Motion for Summary Judgment only as to this argument. Defendant's other objections to Plaintiff's claims are considered under Rule 12(b)(6).

## B.

■ Before bringing suit under the ADA, a litigant must have exhausted the administrative process at the EEOC. That process starts with a charge of discrimination filed by the aggrieved worker. The

---

**2.** I have considered, but do not rely on, a harassment form Plaintiff also completed for the EEOC. This document relates to sexual harassment and does not add anything to her disability claims.

**3.** In converting the Motion to Dismiss, I note that both parties have submitted extrinsic documents relating to administrative exhaustion of the ADA claims. Plaintiff relies heavily on these documents in her argument. (*See* Pl.'s Opp'n at 2–5, 7–8, 12, 16–22.) Thus, Plaintiff has been given, and has availed herself of, a "reasonable opportunity to present

all material made pertinent" to a motion for summary judgment as to administrative exhaustion of the ADA claims. Fed.R.Civ.P. 12(b); *see also Daddazio v. Katherine Gibbs Sch., Inc.*, 1999 WL 228344, at *1 (S.D.N.Y. 1999), *aff'd* 205 F.3d 1322, 2000 WL 225485 (2d Cir.2000) (finding, in converting a motion to dismiss to a motion for summary judgment, that the non-movant plaintiff had "submitted materials outside the pleadings" and thus "was not taken by surprise or deprived of an opportunity to present facts outside the pleadings").

charge forms the basis for an investigation by the agency. The agency's investigation, in turn, establishes the parameters for any subsequent employment discrimination suit by the employee. *See Hubbard v. Rubbermaid, Inc.*, 436 F.Supp. 1184, 1188 (D.Md.1977). In *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir.1981), the Fourth Circuit explained the relationship between the administrative case and civil suit:

> An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.

*See also Evans v. Tech Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir.1996) (explaining that the only claims that can be maintained in a Title VII lawsuit are those stated in the initial charge, reasonably related to claims in the initial charge, or developed by reasonable investigation of the original complaint); *Hubbard*, 436 F.Supp. at 1188 (explaining that "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination").

■ In this case, Rohan checked both the "sex" and "disability" boxes when responding to a question on her EEOC charge of discrimination about the type of discrimination she faced. (Def.'s Mem. App. 1.) Rohan's narrative on the charge form cited "various forms of sexual harassment" that she had encountered at work, and her futile efforts to get management to respond to her complaints. (*Id.*) She also noted the incident involving the disclosure of her disabilities, stating, "I was required to inform the entire cast of my condition. I was also required to inform them of the diagno[sis,] the symptoms and what to do if they saw one." (*Id.*) She

then wrote about her firing, stating that she had been told it was because of "a culmination of ... issues and ... was for my own good." (*Id.*) The charge concludes, "I believe that I was terminated and subject to a sexually hostile environment in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990, as amended." (*Id.*)

A reasonable investigation that could be expected to follow from this charge of discrimination would have included both the allegation of wrongful discharge due to disability and the allegedly forced disclosure of Rohan's disabilities, which constitute Counts I and III of her complaint, respectively. Rohan specifically referred to the September 13 disclosure incident in her charge of discrimination. Thus, it is clear that the EEOC's investigation would have encompassed it. *See Evans*, 80 F.3d at 963 (finding actionable claims that are "stated in the initial charge"). Likewise, an investigation into wrongful discharge also would follow from the complaint, given that Rohan stated that she believed she had been terminated from her job "in violation of ... the Americans with Disabilities Act...." *See id.*

■ On the other hand, Rohan does not mention anywhere on the charge form a failure by Networks to accommodate her disabilities. Moreover, on an ADA form that Rohan completed in conjunction with the charge of discrimination, she was specifically asked whether she could perform her essential job functions without *"reasonable accommodation* (some help from the organization)" (emphasis in original). (Pl.'s Opp'n App. 2.) Rohan's answer was: "Don't need accommodations [sic]—performed better than those around me." (*Id.*) Rohan's silence on the charge form as to the need for or denial of any accommodation, coupled with her flat denial on the ADA form about any need for an accom-

modation, would have foreclosed an EEOC investigation into whether Networks failed to accommodate Rohan.[4] *Cf. Sharafeldin v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 94 F.Supp.2d 680, 687 (D.Md.2000) (finding harassment form to "constitute[ ] evidence that ... additional claims, although not formally included in plaintiff's EEOC charge," likely were investigated by the agency). Because the failure to accommodate claim was not within the ambit of a reasonable investigation stemming from Rohan's charge of discrimination, the administrative remedy as to this claim has not been exhausted.[5] Count II will therefore be dismissed.

### III.

Networks argues, alternatively, that if the ADA claims are not dismissed on the basis of failure to exhaust administrative remedies, they should be dismissed because Plaintiff has not established a threshold requirement under the ADA: that she was disabled within the meaning of the statute. Viewing the evidence in the light most favorable to the non-movant. I find that Plaintiff has stated a claim that she was disabled.[6]

A claim of wrongful discharge under the ADA has four elements, the first of which—and the only element challenged here—is that Plaintiff "is within the ADA's protected class." *Rhoads v. Fed. Dep. Ins. Corp.*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001). The ADA proscribes discrimination against "a qualified individual with a disability...." 42 U.S.C. § 12112(a). The Act defines disability to include: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Plaintiff claims both that she was actually disabled under the Act and that Defendant regarded her as disabled.[7] She states that during her employment with Defendant, she "had a mental impairment

4. Consideration of Plaintiff's 17–page, diary-style statement does not change this result. In the statement, Plaintiff repeatedly mentions frustration with the sexually charged, juvenile atmosphere of the theater tour, including touching and sexual talk that triggered her abreactions. (*See generally* Pl.'s Opp'n App. 5.) However, she also discusses how well she performed her job, and how she did not need accommodations as to the costume-changing process, in which her costume was changed in between scenes in front of the crew by local dressers. (*See id.*) The statement never addresses a specific accommodation Plaintiff sought or needed, but instead contains only such general comments as, "I feel that much of the stress could have been lowered." (*Id.*)

5. Plaintiff cites *Lane* and *Sharafeldin* as supporting her assertion that her accommodation claim had been administratively exhausted. However, in neither case did a plaintiff specifically disavow a claim that he or she later sought to pursue in a civil suit. Those cases are therefore distinguishable from this one.

6. Plaintiff's ADA claim relating to violation of confidentiality of medical records under 42 U.S.C. § 12112(d) is addressed in section IV of this Memorandum. Several circuits have held that a plaintiff need not demonstrate that he or she is disabled in order to make out a violation of this section. *See Cossette v. Minnesota Power & Light*, 188 F.3d 964, 969 (8th Cir.1999); *Fredenburg v. Contra Costa County Dep't of Health Servs.*, 172 F.3d 1176, 1181 (9th Cir.1999); *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 (10th Cir.1998). The Fourth Circuit has not yet spoken on this issue. Because I find Plaintiff has presented evidence that she is actually disabled within the meaning of the statute, I need not determine at this time whether the protections of this provision are limited to those who can show they are disabled.

7. Because I find that Plaintiff has stated a claim that she was actually disabled under the Act, I need not consider whether Networks "regarded" her as disabled.

that substantially limited one or more major life activities." (Compl. ¶ 138.) Specifically, Plaintiff claims she was limited in the major life activities of sleeping, caring for herself, and interacting with others. (Pl.'s Opp'n at 26–27; see also Compl. ¶¶ 74, 79, 82, 85, 88.) Notably, she does not claim to have been limited in her ability to work,[8] asserting instead that she was able to perform her job competently despite her disabilities. (See Compl. ¶¶ 75–77, 80–81, 83–84, 86–87, 91–92.)

Plaintiff states that she has PTSD, depression, abreactions, and dissociation. Depression has been identified as an impairment within the meaning of the ADA. See Baird ex rel. Baird v. Rose, 192 F.3d 462, 467 n. 3 (4th Cir.1999). I thus need not consider at this point whether PTSD,[9] abreactions, and dissociation[10] are impairments within the meaning of the statute. Because depression is an impairment, I proceed to consider whether its effect on Plaintiff substantially limited her ability to perform a major life activity.

 In regulations enacted pursuant to the ADA, "caring for oneself" is identified as a major life activity. 29 C.F.R. § 1630.2(i) (2001). Plaintiff alleges that she could not care for herself because she experienced depression and flashbacks that caused her "great emotional distress and anguish." (Compl. ¶¶ 74, 79.) Depression and flashbacks are symptoms or alleged disabilities themselves. They are not, however, ways in which Plaintiff was substantially limited in her ability to take care of herself. Further, although Plaintiff states that she suffered from emotional distress and anguish, she no where alleges any particular way in which distress and anguish prohibited her from caring for herself. Indeed, Plaintiff acknowledges that she was able to work despite her illness, which entailed a demanding schedule of performances and travel, and that she performed her job competently. (Id. ¶¶ 75–76, 80–81.) Finally, Plaintiff does not even specifically mention the major life activity of caring for oneself in her complaint. For these reasons, Plaintiff does not state a claim that she was disabled by being substantially limited in her ability to care for herself. Cf. Equal Employment Opportunity Comm'n v. Sara Lee Corp.,

---

**8.** This case thus is distinguishable from *Rhoads*, in which the plaintiff claimed to be limited in the major life activities of, *inter alia*, sleeping and working. 257 F.3d at 387. In granting summary judgment to the *Rhoads* defendant on plaintiff's ADA claims, the Fourth Circuit held that the plaintiff's claim that she was substantially limited in her ability to sleep had been subsumed by her claim that her ability to work was impaired. *Id.* at 389–90.

**9.** Numerous courts have held that PTSD can constitute a disability within the meaning of the ADA if it substantially limits a major life activity. *See Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir.1998); *Zale v. Sikorsky Aircraft Corp.*, 2000 WL 306943, at *3 (D.Conn.2000); *Hetreed v. Allstate Ins., Co.*, 1999 WL 311728, at *10 (N.D.Ill.1999), *aff'd* 6 Fed. Appx. 397, 2001 WL 427785 (7th Cir.2001), *cert. denied* — U.S. —, 122 S.Ct. 417, — L.Ed.2d —

(2001); *Sherback v. Wright Auto. Group*, 987 F.Supp. 433, 436 (W.D.Pa.1997); *Coaker v. Home Nursing Servs., Inc.*, 1996 WL 316739, at *12 (S.D.Ala.1996), *aff'd* 98 F.3d 1354 (11th Cir.1996); *cf. Johnston v. Henderson*, 144 F.Supp.2d 1341, 1350–51 (S.D.Fla.2001) (finding PTSD to be a mental impairment covered by the Rehabilitation Act only if it substantially limits a major life activity).

**10.** In *Davis v. Univ. of North Carolina*, 263 F.3d 95 (4th Cir.2001), the Fourth Circuit considered a plaintiff who was diagnosed with dissociative identity disorder (multiple personality disorder) and experienced abreactions. *Id.* at 96–97. However, that case turned on whether the plaintiff was "regarded as" disabled, not on whether she was actually disabled. *Id.* at 99. The Fourth Circuit therefore did not decide whether dissociation and abreactions were impairments within the meaning of the ADA.

237 F.3d 349, 353 (4th Cir.2001) (finding no substantial limit on individual's ability to care for herself where she could take care of her son, drive a car, and "perform[ ] her job effectively").

■ Plaintiff has however, stated a claim that she was substantially limited in the major life activity of sleeping.[11] Sleeping has been identified as a major life activity. *See Williams v. Fed. Express Corp.*, 1999 WL 1940039, at *5 (W.D.N.C. 1999), *aff'd* 202 F.3d 262, 1999 WL 1221386 (4th Cir.1999). An individual is considered to be "substantially limit[ed]" in a major life activity if she either cannot perform a major life activity that an average person can perform or if her ability to perform the activity is significantly restricted in condition, manner, or duration compared to the average person, 29 C.F.R. § 1630.2(j)(1) (2001). Thus, to prove she is substantially limited in the ability to sleep, Plaintiff must demonstrate that the difficulties she has sleeping are "worse than [those] suffered by a large portion of the nation's adult population ." *See Williams*, 1999 WL 1940039, at *5; *see also Sara Lee*, 237 F.3d at 352–53 (noting that many people "fail to receive a full night of sleep," but that this is insufficient to prove a substantial limitation on a major life activity). In her complaint, Plaintiff alleges that she suffered "substantial disruption" in her sleep during the "Jekyll & Hyde" tour. (Compl.¶ 85.) Viewing the evidence in the light most favorable to the Plaintiff, it is possible that a "substantial disruption" in sleep could be proven to be worse than the insomnia or other sleep problems suffered by the average adult. Because Plaintiff has stated a claim that she was actually disabled, the Motion to Dismiss Count I will be denied.

## IV.

■ In Count III, Plaintiff alleges that Defendant violated the provision of the ADA requiring employers to maintain the confidentiality of information concerning an employee's medical condition. Plaintiff claims Defendant violated this provision by forcing her to disclose to her fellow cast members "the fact of her mental impairment, the fact that the impairment stemmed from childhood incest and sexual abuse, the fact that she was taking medication, and the fact that she was being treated by a mental health professional. . . ." (Compl.¶ 1.56.)

The ADA provision that deals specifically with employee medical information, 42 U.S.C. § 12112(d), governs conduct by employers both before and after they hire an employee. Before an employee has been hired, an employer may inquire into "the ability of an applicant to perform job-related functions," 42 U.S.C. § 12112(d)(2)(B). After employment, an employer may not require a medical examination nor make inquiries into an employee's disability unless the exam or inquiry is shown to be "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Employers are allowed to gather disability information from employees in several ways. First, they may "conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program. . . ." 42 U.S.C. § 12112(d)(4)(B). Second, the employer "may make inquiries into the ability of an employee to perform job-related functions."[12] *Id.* All information received by employers via these two channels must be kept confidential, 42 U.S.C.

11. I need not decide whether Plaintiff was substantially limited in the third major life activity she cites, interacting with others. The Fourth Circuit has expressed doubt as to whether "the ability to get along with others" is a major life activity. *See Davis*, 263 F.3d at 101 n. 4.

12. Courts in several circuits have read 42 U.S.C. § 12112(d) as requiring confidentiality

§ 12112(d)(4)(C), as must information gained through employment entrance examinations. 42 U.S.C. § 12112(d)(3)(B). This disability information may be disclosed only in limited circumstances to supervisors and managers, first aid and safety personnel, and government officials investigating ADA compliance. 42 U.S.C. § 12112(d)(3)(B); *see also* 29 C.F.R. § 1630.14(d) (2001) (echoing language of the statute).

In order to gain protection under § 12112(d), Plaintiff argues that she provided a "voluntary medical history" to Networks when she discussed her disability with Defendant's managers, Gentry and Pfamer. This argument is unpersuasive. The plain language of the statute protects only voluntary medical histories "which are part of an employee health program available to employees at that work site." 42 U.S.C. § 12112(d)(4)(B). Plaintiff did not disclose information on her disability as part of an employee health program.

Plaintiff does not argue that she falls within the protection of 42 U.S.C. § 12112(d) because she responded to an employer inquiry. If Plaintiff wants to make such an argument, she can seek leave to amend her complaint. However, as the complaint now stands, I will grant Defendant's Motion to Dismiss Count III.[13]

## V.

Defendant's final argument is that this court lacks jurisdiction to consider Plain-tiff's common law tort and contract claims. The argument is premised on the assumption that, were I to grant Defendant's Motion to Dismiss as to all three ADA claims, this court could no longer exercise supplemental jurisdiction over the common law claims. However, because I have not dismissed Count I, it is appropriate for the court to continue to exercise jurisdiction over the related claims. *See* 28 U.S.C. § 1367(a).

Defendant also raises additional objections to Plaintiff's invasion of privacy claim: first, that it is barred by Maryland's workers' compensation statute; second, that it fails to state a claim for intrusion into one's private affairs, a branch of the tort of invasion of privacy.

## A.

Assuming that any workers' compensation scheme applies to the present case, it would be Maryland's. This scheme does not bar Plaintiff from suing for invasion of privacy.

In *Hauch v. Connor*, 295 Md. 120, 453 A.2d 1207 (1983), the Maryland Court of Appeals expounded on conflict of law issues in the workers' compensation context, finding that such issues present "distinct policy questions and should not be treated as tort or contract matters for choice of law purposes." *Id.* at 1211. In this case, I find no basis for applying South Carolina's workers' compensation scheme, and Plaintiff offers none.[14] Both parties are Mary-

---

of employee medical information only when the employer obtains this information as a result of an employee health program or an inquiry. *See Cash v. Smith,* 231 F.3d 1301, 1307 (11th Cir.2000) (holding that 42 U.S.C. § 12112(d) and the associated regulation do not protect the confidentiality of "voluntary disclosures initiated by the employee ...."); *Yoder v. Ingersoll–Rand Co.,* 31 F.Supp.2d 565, 569 (N.D.Ohio 1997), *aff'd* 172 F.3d 51, 1998 WL 939885 (6th Cir.1998) (finding that "[t]he statute goes no further than requiring

employers to keep [a] limited class of medical records confidential").

**13.** I do not consider whether Plaintiff states a claim for this disclosure incident under 42 U.S.C. § 12112(a), the general prohibition against discrimination, since Plaintiff does not allege a violation of this provision in her complaint.

**14.** The only conceivable rationale for applying South Carolina workers' compensation law to

land residents [15] and the employment relationship was formed in Maryland, where the employment contract was signed. (Compl. ¶¶ 5, 7–8, 28, 30–39; Def.'s Reply at 12.) I therefore examine whether Plaintiff's claim is barred by Maryland's workers' compensation statute.

Maryland's Workers' Compensation Act has been held by the Maryland courts not to cover intentional acts. *See, e.g., Le v. Federated Dep't Stores, Inc.,* 80 Md.App. 89, 560 A.2d 42, 44 (1989), *aff'd* 324 Md. 71, 595 A.2d 1067 (1991) (holding that workers' compensation statute does not bar suit on "non-physical" torts, such as false arrest, defamation, and intentional infliction of emotional distress); Md.Code Ann. Lab. & Empl. § 9–509(d) (2000) (allowing private damages actions for injuries that result from the "deliberate intent of the employer to injure ... the covered employee"). An employer acts with deliberate intention when it has "determined to injure an employee ... and used some means to accomplish this goal." *Johnson v. Mountaire Farms of Delmarva, Inc.,* 305 Md. 246, 503 A.2d 708, 714 (1986). In this case, accepting Plaintiff's allegations as true, Defendant intentionally forced Plaintiff to reveal her disabilities to others, and as a direct result Plaintiff suffered injuries. (Compl.¶¶ 168–73.) Plaintiff's claim thus is not barred by Maryland's Worker's Compensation Act.

### B.

Defendant next argues that Plaintiff fails to state a claim for invasion of privacy. I first address choice of law, before moving to the substance of Defendant's argument.

The choice of law analysis as to this substantive tort claim is different than that used to determine which state's workers' compensation statute applies. Plaintiff's claim for invasion of privacy is covered by South Carolina law, as she argues. In tort cases, Maryland follows the principle of *lex loci delicti,* applying the substantive tort law of the state where the alleged wrong occurred. *See Hauch,* 453 A.2d at 1209. Since Plaintiff alleges that Defendant violated her privacy by forcing her to reveal her disability at a meeting of the theater company in South Carolina, resulting in injury to her in South Carolina, South Carolina law will apply.

South Carolina's courts have recognized three branches of the tort of invasion of privacy, of which the second is relevant here—"the publicizing of one's private affairs with which the public has no legitimate concern." *Meetze v. Associated Press,* 230 S.C. 330, 95 S.E.2d 606, 608 (1956). The South Carolina Supreme Court elaborated on this tort in *Swinton Creek Nursery v. Edisto Farm Credit,* 334 S.C. 469, 514 S.E.2d 126 (1999), stating that this branch of the tort has four elements: "(1) publicizing, (2) absent any waiver or privilege, (3) private matters in which the public has no legitimate concern, (4) so as to bring shame or humiliation to a person of ordinary sensibilities." *Id.* at 131.

Defendant attacks Plaintiff's ability to prove the first prong, that of publicity. It alleges that Plaintiff has failed to state a claim because she *"herself* voluntarily made the details of her private life and

---

this tort claim is that the alleged injury occurred there. However, in *Hauch,* the Maryland Court of Appeals stated that the rationale of *lex loci delicti,* in which the substantive tort law of the state where the wrong occurs governs, has generally not been found applicable

to workers' compensation choice of law questions. 453 A.2d at 1211–12.

**15.** Networks was organized in Texas, but has its principal place of business in Maryland. (Compl.¶¶ 6, 8.)

mental condition known to management of the defendant and informed defendant's other employees of her own volition as well" (emphasis in original). (Def.'s Reply at 11.) Plaintiff urges that she did not reveal her disability voluntarily, stating that "it was most assuredly *the defendant,* not plaintiff, which disclosed the private matters at issue, as defendant simply used plaintiff as its unwilling mouthpiece to accomplish the disclosure" (emphasis in original). (Pl.'s Opp'n at 42.) In other words, the dispute is over whether the element of publicity in an invasion of privacy case is satisfied when the plaintiff herself publicizes the information at issue as a result of compulsion.

Defendant notes that Plaintiff points to no cases supporting her position that such compelled disclosure by a plaintiff herself constitutes publicity.[16] However, Plaintiff's proposition does have a parallel in another branch of tort law, that of defamation.[17] In defamation cases, some courts have recognized the doctrine of compelled self-publication by a plaintiff, which occurs when a plaintiff is forced to communicate a statement to a third party that defames the plaintiff. *See generally* David P. Chapus, Annotation, Publication of Allegedly Defamatory Matter by Plaintiff ("Self–Publication") as Sufficient to Support Defamation Action, 62 A.L.R.4th 616 (1988). While I can find no court that has recognized a parallel to compelled self-publication in an invasion of privacy case, I note that such a doctrine would accord with the general legal principle that a principal who

causes or forces another to commit an act on the principal's behalf, essentially using that person as his agent or instrumentality, is in effect the party who has committed the act. In any event, since a novel question of state law is presented and since pursuit of the invasion of privacy claim will not substantially affect the scope of discovery, it makes sense to deny Defendant's motion to dismiss the claim without prejudice to Defendant renewing its argument by way of a motion for summary judgment at the close of discovery. At that time, the parties can brief the issue more thoroughly.

A separate order effecting the rulings made in this memorandum is attached.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 3rd day of December 2001, ORDERED that:

1. Summary judgment is granted to the Defendant as to Count II;

2. Defendant's motion to dismiss is granted as to Count III;

3. Defendant's motion to dismiss is denied as to Counts I, IV, and V.

---

**16.** Plaintiff does cite *McCormick v. England,* 328 S.C. 627, 494 S.E.2d 431 (S.C.App.1997), for the proposition that invasion of privacy claims "focus[ ] on the content rather than the source of the information." *Id.* at 438. However, the *McCormick* case, which recognizes a common law tort claim for a physician's breach of confidentiality owed to his patient, does not discuss who can serve as a source of publicity in invasion of privacy cases; rather, its focus is on the difference in

content requirements between the two torts. *See id.*

**17.** Of course, the torts of invasion of privacy and defamation are different, and the publication requirement in defamation is a distinct notion from the publicity requirement in invasion of privacy cases. I cite the example of defamation doctrine only by way of illustration of the principle involved in this case.