PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 15-1811

---

GAVIN CLASS,

> Plaintiff - Appellee,

> v.

TOWSON UNIVERSITY,

> Defendant - Appellant.

-------------------------------------

AMERICAN MEDICAL SOCIETY FOR SPORTS MEDICINE; MARYLAND ATHLETIC TRAINERS ASSOCIATION; NATIONAL ATHLETIC TRAINERS' ASSOCIATION, INC.; NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

> Amici Supporting Appellant.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge. (1:15-cv-01544-RDB)

---

Argued: September 16, 2015          Decided: November 13, 2015

---

Before NIEMEYER, KEENAN, and WYNN, Circuit Judges.

---

Reversed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Keenan joined. Judge Wynn wrote an opinion concurring in part and dissenting in part.

---

**ARGUED**: Julia Doyle Bernhardt, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant. Steven M.

Klepper, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellee. **ON BRIEF:** Brian E. Frosh, Attorney General of Maryland, Kathleen E. Wherthey, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant. Andrew M. Dansicker, LAW OFFICE OF ANDREW M. DANSICKER, LLC, Hunt Valley, Maryland, for Appellee. Mitchell Y. Mirviss, VENABLE LLP, Baltimore, Maryland, for Amici American Medical Society for Sports Medicine, Maryland Athletic Trainers Association, and National Athletic Trainers' Association, Inc. Philip S. Goldberg, William C. Martucci, Washington, D.C., William C. Odle, Corby W. Jones, SHOOK, HARDY & BACON, L.L.P., Kansas City, Missouri, for Amicus National Collegiate Athletic Association.

———————————

NIEMEYER, Circuit Judge:

On August 12, 2013, as the temperature in Baltimore reached 91°F, Gavin Class, a Towson University student, collapsed with exertional heatstroke while practicing as a member of the Towson University football team. He was transported to the Shock Trauma Unit at the University of Maryland Medical Center in Baltimore, where he remained in a coma for nine days and almost died. He suffered multi-organ failure, requiring a liver transplant and numerous additional surgeries.

Following a protracted recovery involving a high level of perseverance, Class returned to classes at Towson University in January 2014 and thereafter pursued his plan to return to NCAA Division I football. Applying its "Return-to-Play Policy," however, Towson University refused to clear Class to play because the Team Physician, a board-certified sports medicine doctor, concluded that allowing Class to participate in the football program presented an unacceptable risk of serious reinjury or death. The Return-to-Play Policy gave Towson University's Team Physician "final authority" over the issue.

Class commenced this action against Towson University, alleging that its decision to exclude him from the football program amounted to a violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. He alleged that his inability to regulate

3

his body temperature and his susceptibility to heatstroke constituted a "disability," as defined by those Acts, and that he was qualified to play intercollegiate football if Towson University agreed to his proposed accommodations. Following a one-day bench trial, the district court agreed with Class, concluding that Class' proposed accommodations were reasonable and that Towson University had violated the ADA and the Rehabilitation Act. The court entered judgment against Towson University, issuing a permanent injunction prohibiting it from violating those Acts.

On appeal, Towson University contends that the district court erred in concluding (1) that Class was disabled as the term is defined by the Acts and (2) that Class was "otherwise qualified" for the football program with the accommodations he proposed. It also challenges several evidentiary rulings made by the district court during trial.

For the reasons given herein, we reverse the district court's judgment, vacating its injunction. While we recognize that the question of whether Class had a disability, as defined by the Acts, is a close one, we nonetheless conclude that Class was not "otherwise qualified" to participate fully in Towson University's football program because the University reasonably applied its Return-to-Play Policy. Giving deference to Towson University's judgment, as we are required to do, we uphold its

4

determination. In view of these conclusions, we do not reach Towson University's challenge to the district court's evidentiary rulings.

I

After Class played NCAA Division III football at the University of Rochester for two years, he transferred to Towson University to play Division I football. And, in early August 2013, Towson University's football coach informed Class that he had won a starting position as an offensive guard. Two days later, however, on August 12, 2013, Class collapsed during drills from an exertional heatstroke and was taken to the Shock Trauma Unit at the University of Maryland Medical Center. Class' heatstroke resulted in multi-organ failure, including liver failure, necessitating a liver transplant. According to Dr. William R. Hutson, Class' treating physician, without the transplant, "there is no question that [Class] would have died." Class was in a coma for nine days and endured more than a dozen other surgical procedures. He was hospitalized for nearly two months, receiving intensive medical care that included chemotherapy to treat post-transplant complications.

Class still suffers from the effects of his medical trauma. As a result of the liver transplant, he has a weakened abdominal wall, which places his internal organs at risk of injury. He

5

must take immunosuppressive medications, which increase his risk of infection. And he is at a heightened risk of subsequent heatstroke. Class' physicians have also cautioned that any future surgeries would be more complicated.

After leaving the hospital, Class began a lengthy and grueling recovery process. Initially unable to stand, he progressed over a six-month period from using a walker to beginning to run. In January 2014, he resumed classes as a student at Towson University and began training in pursuit of his hope of returning to playing football. While conditioning on his own, Class expressed his wish to rejoin the team for the 2015-16 football season. As with any student-athlete seeking to return to play from injury, Towson University's athletic staff directed Class' request to play to the Team Physician, Dr. Kari E. Kindschi.

Dr. Kindschi was the Medical Director of the Arnold Palmer SportsHealth Center for Sports Injuries at MedStar Union Memorial Hospital in Baltimore. Under a preexisting contract, Dr. Kindschi served as the Medical Director of Athletics at Towson University and the head Team Physician for the University's 19 Division I teams, including its football team. Four other MedStar physicians were also engaged to provide services to Towson University's student-athletes, and those physicians oversaw the three athletic trainers assigned to the

6

football team. In the fall of 2014, Dr. Kindschi and the physicians on the MedStar medical review team, all of whom were board certified in sports medicine, unanimously concluded that Class could not safely participate fully in Towson University's football program. They reached this conclusion after Dr. Kindschi conducted a physical examination of Class; reviewed his medical records and his medical history; reviewed the results of a heat tolerance test conducted on August 21, 2014; consulted Class' liver-transplant physicians; and reviewed medical literature. Dr. Kindschi did, however, clear Class to participate in "no contact conditioning in [a] cool environment."

The August 2014 heat tolerance test was conducted by the Korey Stringer Institute, a center at the University of Connecticut that researches issues related to heatstroke and heat illness. The Institute was founded in the wake of the death of Korey Stringer, an All-Pro offensive lineman in the National Football League who died after suffering a heatstroke. The Institute conducted a "low intensity" heat tolerance test on Class and found that, in an environment of 104°F with 40% humidity, Class was "un-able to sustain low intensity exercise in a hot environment for 70 minutes." While the test required that Class maintain a rectal temperature of 101.3°F or lower for

7

two hours, he exceeded that temperature just over halfway into the two-hour test.

After Class continued to train, Towson University again engaged the Korey Stringer Institute to conduct another "low intensity" heat tolerance test on Class on February 6, 2015, using the same conditions and standards as were used in the first test. This time, Class completed the test, having had a rectal temperature of no higher than 101.2°F. The Institute concluded:

> At this point we suggest that you only exercise in cool environments ranging from low to high intensity (including football practices), and only low to moderate intensity in warmer environments. We strongly suggest having a second test done prior to any intense conditioning that is done in a warm to hot environment. This would be done in order to determine your body's response to high exercise intensity coupled with heat exposure, most likely before returning to practice in August.

The report included restrictions and conditions for Class' continued progress.

Thereafter, Dr. Kindschi again refused to clear Class for participation in the football program because he had not shown that he had "sufficient heat tolerance to handle competitive football practices, including scrimmages, and play outdoors in seasonal heat." She made her judgment after again reviewing Class' medical records, including both the Institute's August 2014 and February 2015 tests, as well as a letter from Dr.

Hutson, the lead treating physician on his liver-transplant team, concluding that Class was "at acceptable risk to play collegiate football . . . with appropriate padding and protection." She also consulted with other medical professionals at MedStar Union Memorial Hospital and with representatives of Towson University's Athletic Department. Dr. Kindschi noted that the test conditions for the February 2015 heat tolerance test did not adequately mimic the conditions that Class "would face playing competitive football" and that Class had not passed any test wearing the specialized padding recommended to protect his liver and the standard football gear, including the pads and helmet required for playing football.

Consistent with NCAA requirements and national best practices, Towson University applied a written Return-to-Play Policy, which provided that the University's Team Physician has the final and autonomous authority in deciding if and when an injured student-athlete may return to practice or competition. The Policy provided in relevant part:

> A Towson University Team Physician or his/her designee, in consultation with a Towson University certified athletic trainer, has the final authority in deciding if and when an injured student-athlete may return to practice or competition. A student-athlete's private physician DOES NOT have any jurisdiction as to the participation status of the student-athlete. Any student-athlete seen by a physician other than the Towson University Team Physician must return to the Sports medicine clinic

9

for follow-up and final clearance prior to active participation status.

(Emphasis added).

After Class obtained counsel, who made a formal demand for Class to be fully reinstated in the football program, Towson University formally responded with a letter dated May 4, 2015, stating that, based on its Return-to-Play Policy, it was denying Class' request. The letter stated:

> [T]he University, with the advice of the MedStar medical professionals in its athletic department, has determined that while Mr. Class has made admirable strides in his recovery, he is unable to return to playing football safely and that no reasonable accommodation can be made to adequately protect him from potentially devastating health effects.
>
> *   *   *
>
> The sports medicine professionals believe that the risk of serious injury or death as a result of another heat stroke is too great to clear Mr. Class to play. As I am sure you are aware, Mr. Class's prior heat stroke led to a cascade of devastating complications, including multi-organ failure, which resulted not only in the need for a liver transplant, but also in a very complicated hospital course, several additional surgeries due to wound infections, and post-transplant lymphoproliferative disease that required chemotherapy.
>
> Most importantly, Mr. Class remains at risk for another heat stroke. His prior severe heat stroke is a significant risk factor for future heat illness. While some of his current transplant-related medical risks can be minimized with measures such as abdominal padding and medications, Mr. Class's risk of heat stroke is not capable of adequate prevention with any reasonable restriction or accommodation. Routine temperature monitoring alone would not adequately provide for his safety, and the sports medicine professionals cannot fashion a reasonable or practical

10

precaution that would adequately protect Mr. Class from another serious heat related illness. The individuals involved in this decision agree that it would be irresponsible to permit Mr. Class to be exposed to another potentially catastrophic event.

A few weeks later, Class commenced this action against Towson University, alleging that its decision to exclude him from the football program violated the ADA and the Rehabilitation Act and seeking an injunction "to allow [him] to fully participate" in the program. In his complaint, Class alleged that he was disabled in that his "inability to regulate his body temperature and susceptibility to heat stroke substantially limit major life activities, including regulating body temperature, walking, standing and running, when he experiences a heat stroke," but that he could fully return to football with reasonable accommodations. He alleged that he undertook his recovery process "to become the first person to come back from exertional heatstroke and a liver transplant to play football." He proposed various accommodations, based on the Korey Stringer Institute's suggestions, which, he contended, were "reasonable accommodations which could be performed by Towson with minimal cost or disruption to the football program." He claimed that Towson University's refusal to allow him to participate in football with these accommodations discriminated against him by reason of his disability.

11

Following the commencement of this action and Class' continued training, the Korey Stringer Institute conducted a third heat tolerance test of Class on June 19, 2015. This was a "moderate intensity" test that required Class, in an environment of 104°F with 40% humidity, to maintain a rectal temperature of 103.1°F or lower for a period of one hour. The Institute reported that Class was able to maintain the specified temperature for 50 minutes, but, unlike the prior test reports, the June 2015 report did not specify what rectal temperature was reached at any point during the test. Rather, it stated:

> While there was not a plateau in your rectal body temperature, your rate of rise was low enough to allow you to complete 50 minutes of exercise with an expected body temperature for individuals exercising in the heat. The only limiting factor to completing 60 minutes of exercise was muscular fatigue, which is expected for your fitness, sport and physical make up.

The report concluded, "Given your previous tests it is very encouraging to see that you have been able to make predictable and significant improvements in you ability to handle exercise in the heat. You have made sizeable gains, and it is important to maintain the gains you have made and continue to spend time maintaining and improving your fitness." The report stated that Class could "fully participate with regularly scheduled football practices," subject to five conditions -- which it "strongly recommended." As detailed further in the report, the five conditions were that Class:

12

(1) [c]ontinue to perform conditioning workouts outside;

(2) [c]ontinue to follow the mandated NCAA heat acclimatization guidelines;

(3) [m]onitor [his] body temperature when performing new/unique exercise or conditioning sessions;

(4) [m]onitor [his] fluid needs and match his fluid losses; and

(5) [conduct] [a]ll exercise progression . . . at the discretion and direct observation of a medical professional.

At the bench trial in this case, the Institute's Chief Operating Officer, Dr. Douglas J. Casa, a certified athletic trainer who holds a Ph.D. in exercise physiology, testified that the temperature monitoring condition (condition 3) in the June 2015 test report could be accomplished by using a "CorTemp" system, which would require Class to ingest a small electronic device that would track his internal body temperature and communicate the readings through a low-frequency radio waves to a nearby handheld monitor. As Dr. Casa explained, the system would require that the monitor be positioned near Class for 3 to 5 seconds every 5 to 10 minutes, which would provide data with sufficient frequency to allow Class to cease physical activity before his internal temperature reached the dangerous level at which a heatstroke could occur.

Dr. Kindschi testified, however, that the Institute's June 2015 test did not alter her professional judgment as it did not

13

clear Class "to return to football" but only to "a progression of activities" that would require monitoring and a follow-up. She expressed concern about data omitted from the Institute's June report that appeared in the prior two reports. Finally, she continued to note that the June test was not conducted under conditions that mimicked actual football practice and games and in an environment reflecting Baltimore's heat and humidity.

Following the one-day bench trial, the district court found that Class had a disability within the meaning of the ADA and the Rehabilitation Act because "both [his status] as a transplant recipient and victim of heat stroke . . . seriously affected major life activities."[1] "[A]lternatively," the court held, "Class clearly qualifie[d] as an individual with a record of a protected disability under 42 U.S.C. § 12102(1)(B)." The court determined that Towson University had discriminated against Class on the basis of this disability by refusing to provide the requested accommodations, particularly the abdominal padding and internal temperature monitoring, which the court found to be reasonable. By judgment dated July 17, 2015, the

---

[1] The district court's conclusion that Class was disabled "as a transplant recipient" is not an issue presented to us. In his complaint, Class alleged only that his "inability to regulate his body temperature and susceptibility to heat stroke" characterized his disability. Moreover, Towson University has acknowledged that only the "heatstroke and the related issues with that" motivated its decision not to clear Class for participation in its football program.

14

court permanently enjoined Towson University "from violating [Class'] rights under the Americans with Disabilities Act and Section 504 of the Rehabilitation [Act] by prohibiting him from participating in the University's football program resulting from medical concerns related to his status as a transplant recipient and heat stroke victim."

From the judgment entered, Towson University filed this appeal. By order dated July 28, 2015, we granted Towson University's motion to stay the district court's judgment, and on August 6, 2015, we granted Class' motion to order an expedited appellate schedule.

## II

Towson University contends first that the district court erred in finding that Class, as a "victim of heat stroke," is disabled within the meaning of the ADA.[2] Recognizing that "disability," as defined by the Act, means a "physical or mental impairment that substantially limits one or more major life

---

[2] Class brought this action under both the ADA and the Rehabilitation Act. For convenience of discussion, however, we discuss the issues only under the ADA, as the standards that we apply are the same for both Acts. See Halpern v. Wake Forest Univ. Health Sciences, 669 F.3d 454, 461 (4th Cir. 2012) (citing Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005)). While the Acts differ with respect to causation, see Baird ex. rel. Baird v. Rose, 192 F.3d 462, 468-70 (4th Cir. 1999), that is not at issue here. Under the Rehabilitation Act, the plaintiff must also establish that the defendant received federal funds, see 29 U.S.C. § 794(a), but that also is not at issue here.

15

activities," 42 U.S.C. § 12102(1)(A), Towson University argues that Class did not "present any evidence that his impaired ability to thermoregulate affects a major life activity or that thermoregulation itself is a major bodily function." It reasons that Class' increased risk of reoccurrence of heatstroke as a result of his original heatstroke "does not establish that he has a disability because that increased risk is just that -- a risk; it does not substantially limit either a 'major life activity' or 'the operation of a major bodily function.'"

While Towson University acknowledges that an impairment that is episodic or in remission would qualify as a disability if it substantially limits a major life activity "when active," 42 U.S.C. § 12102(4)(D), the University contends that Class' limitations on thermoregulation are not episodic or in remission. It asserts that "Mr. Class makes no claim that he still suffers any such impairments or that such impairments are likely to return. . . . The only activity as to which Mr. Class claims any current, actual or potential impairment is the one at heart of this suit: playing intercollegiate football." And that, it suggests, is clearly not a major life activity. See, e.g., Knapp v. Northwestern Univ., 101 F.3d 473, 480 (7th Cir. 1996) ("Playing intercollegiate basketball obviously is not in and of itself a major life activity, as it is not a basic

16

function of life on the same level as walking, breathing, and speaking").

Class contends that he has never asserted that playing football is a major life activity. Rather, he contends that the question is whether his impairment, "when active," substantially limits a major life activity, such as walking, caring for himself, or lifting objects. He reasons:

> The evidence at trial indicated that Class may be at an increased risk of a reoccurrence of heat stroke as a result of his original injury -- or in other words, that Class' disabilities are currently in remission. If Class had a recurrence of heat stroke -- the very thing the accommodations are designed to prevent -- he would be unable to engage in "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). That is all the law now requires.

(Internal quotation marks and citation omitted).

The statutory requirements for showing disability are not disputed. An individual has a disability under the ADA when he "(A) [has] a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) [has] a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(1). Class rests his claims on subsections (A) and (B).

A "major life activity" is in turn defined to include (1) basic tasks that are part of everyday living, such as "caring

17

for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, [and] lifting," 42 U.S.C. § 12102(2)(A) (providing a nonexhaustive list); and (2) the "operation of a major bodily function," id. § 12102(2)(B). In response to the Supreme Court's strict construction of this provision, which had indicated that a temporary impairment could not be a disability, see Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198-99 (2002), Congress enacted the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. That Act provides that the term "disability" must be "construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by [the ADA]." 42 U.S.C. § 12102(4)(A). Overturning Toyota, the ADA Amendments Act also provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." Id. § 12102(4)(D) (emphasis added).

Relying on the ADA Amendments Act, Class argues that playing football could incite his impaired ability to thermoregulate, activating a condition that is otherwise dormant. Of course, when active, the condition would clearly limit the major life activities of walking, lifting, and caring for oneself, as occurred during Class' 2013 exertional heatstroke.

18

The unanswered question in Class' argument is whether the statutory term "when active" must imply an activation of the impairment prompted by normal life conditions. In this case, Class' limitation on thermoregulation can become active only under the extreme exertion of a prolonged and demanding football practice or game in high heat and humidity. In such conditions, anyone could suffer heatstroke. If "when active" were to include the possibility of activation under any condition, however extreme, it would encompass a broad range of limitations or impairments that would drastically expand the scope of "disability" under the ADA. For example, with such a definition of disability, the inability of one mountain climber to oxygenate as well as another climber at very high altitudes, such as during an ascent of Mt. Everest, could be considered a disability.

While a closer analysis might find it difficult to extend the definition of disability to cover a condition that becomes active only under extreme conditions, far beyond the scope of normal daily living, we need not engage in that novel analysis in this case in light of our following conclusion that Class is not "otherwise qualified" to participate in Towson University's football program with accommodations. For the same reason, we need not address whether Class has "a record of such an impairment." 42 U.S.C. § 12102(1)(B).

19

As noted, Class must also carry the burden of showing that he is "otherwise qualified" to participate in Towson University's football program by establishing "(1) that he could satisfy the essential eligibility requirements of the program . . . and (2) if not, whether 'any reasonable accommodation by [Towson University] would enable' [him] to meet these requirements." Halpern v. Wake Forest Univ. Health Sciences, 669 F.3d at 454, 462 (4th Cir. 2012) (quoting Tyndall v. Nat'l Educ. Ctrs., Inc., 31 F.3d 209, 213 (4th Cir. 1994). In the context of postsecondary education, a disabled person is qualified if he shows that he "meets the academic and technical standards requisite to admission or participation in the [school's] education program or activity." 45 C.F.R. § 84.3(l)(3); see also 42 U.S.C. § 12131(2); Knapp, 101 F.3d at 482. "The term 'technical standards' refers to all nonacademic admissions criteria that are essential to participation in the program in question." Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 406 (1979) (quoting an explanatory note to the original regulations). And a nonacademic eligibility criterion is essential if it "'bear[s] more than a marginal relationship to the [program] at issue.'" Halpern, 669 F.3d at 462 (quoting Tyndall, 31 F.3d at 213).

20

In determining whether an educational institution's eligibility requirement is essential and whether it has been met, we accord a measure of deference to the school's professional judgment. See Halpern, 669 F.3d at 462-63 (citing Supreme Court cases "[i]n the context of due-process challenges" and several cases in which "our sister circuits have overwhelmingly extended some level of deference to schools' professional judgments regarding students' qualifications when addressing disability discrimination claims"); see also Davis v. Univ. of N.C., 263 F.3d 95, 102 (4th Cir. 2001) (explaining in dicta that in the context of academic eligibility requirements and disability challenges, this court "generally accord[s] great deference to a school's determination of the qualifications of a hopeful student"). Of course, in according deference, we still must take special care to ensure that eligibility requirements do not "disguise truly discriminatory requirements." Halpern, 669 F.3d at 463 (internal quotation marks and citation omitted).

Towson University contends that satisfying its Return-to-Play Policy, which requires clearance by the Team Physician, is an essential eligibility requirement for participation in its football program (as well as other athletic programs), reflecting the need that participation in athletics be conducted in a healthy and safe manner. Applying such a health-and-safety requirement does not seem to be controversial in this case or in

21

many others. See, e.g., Knapp, 101 F.3d at 483 ("[A]lthough blanket exclusions are generally unacceptable, legitimate physical requirements are proper" to ensure the health and safety of student-athletes (citing Southeastern Cmty. Coll., 442 U.S. at 407)); cf. Halpern, 669 F.3d at 463 (holding that professionalism was an essential requirement of a medical school program in part because "inappropriate and disruptive behavior by physicians increases adverse patient outcomes"); Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265-66 (4th Cir. 1995) (determining, based on Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273 (1987), that an HIV-positive medical resident was not otherwise qualified because he posed a significant risk of transmitting the infectious disease to others). Analogously, the Supreme Court has held that employers may consider the risk a potential employee's disability poses to himself in determining whether he is qualified for a job. See Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 84-86 (2002).

Unlike with many other educational activities, physical risk is an inherent element of athletic programs. The NCAA, as amicus, explains that decisions about the impact of health and safety risks on players "are made daily" concerning a host of "medical conditions[,] such as concussion, cervical spine trauma, cardiac arrest, knee injuries, and more." Granting the Team Physician final clearance authority, a policy that is

22

consistent with NCAA guidelines and national best practices, is a fair and reasonable manner for Towson University to coordinate these essential determinations for the unique and dynamic medical profiles of its several hundred student-athletes. While this policy does not completely safeguard against possible discrimination, it helps to ensure that the physician's ethical and professional imperative to care for the best interests of student-athletes trumps other university concerns or motivations, including those that could be discriminatory. Cf. Arline, 480 U.S. at 287-88 (explaining that an "otherwise qualified" inquiry must be guided by "facts, based on reasonable medical judgments given the state of medical knowledge, about . . . the nature of the risk" posed by an individual's participation in the program).

Accordingly, we conclude that Towson University's requirement that a student-athlete obtain the Team Physician's clearance before returning from injury is legitimately an essential eligibility requirement. Class does not appear to dispute this. Nor does he contend that he is able, without accommodation, to participate healthily and safely in the football program. Rather, he contends that the Team Physician's decision to reject his proposed accommodations to allow him to play football healthily and safely was unreasonable because, as he argues:

[The Team Physician] has been practicing medicine for five years and admittedly has no expertise (and virtually no experience) in dealing with heat stroke. She never explained why it would be unsafe for Class to return to the football field. She merely stated that she was concerned about his ability to thermoregulate, that she was concerned that he had a propensity for heat stroke, that any future heat stroke could be catastrophic, and that she consulted unidentified colleagues at MedStar (without claiming any heat stroke expertise on their part). She acknowledged that she was not aware of any scientific literature or research that supported her opinion.

* * *

In other words, [the Team Physician's] medical opinion was based on her feelings, not on any medical or scientific evidence.

The dispositive question, therefore, is whether the Team Physician's opinion was reasonable -- i.e., whether it was "individualized, reasonably made, and based upon competent medical evidence." Knapp, 101 F.3d at 485. And in resolving this question, we give the Team Physician's decision -- and derivatively, Towson University's decision -- a measure of deference. See Halpern, 669 F.3d at 462-63; Davis, 263 F.3d at 102; Knapp, 101 F.3d at 484; Doe, 50 F.3d at 1266. Nonetheless, when considering whether the decision is reasonable, we must be satisfied that it was consistent with the University's statutory obligations to provide reasonable accommodations and not a pretext for illegal discrimination. See Halpern, 669 F.3d at 463; Knapp, 101 F.3d at 483. Stated otherwise, in evaluating reasonableness, we must determine whether the Team Physician's

24

decision and, derivatively, Towson University's decision (1) was a good-faith application of its policy to protect the health and safety of student-athletes, (2) was in compliance with the University's statutory obligations to provide reasonable accommodations, and (3) was not a disguise for discrimination under the ADA or the Rehabilitation Act. Because the record here indicates that Dr. Kindschi and Towson University applied the Return-to-Play Policy in good-faith and that the decision not to fully reinstate Class was not simply a pretext for unlawful discrimination, we focus on whether Dr. Kindschi and Towson University reasonably considered Class' proposed accommodations.

Class proposes six accommodations, which, he argues, would satisfy Towson University's need for his healthy and safe participation in the football program and thus render him "qualified" under Towson University's Return-to-Play Policy. Specifically, he proposes the use of padding to protect his abdominal wall and the implementation of the five conditions listed in the Korey Stringer Institute's June 2015 test report, two of which are challenged by Towson University as unreasonable: (1) the condition that Class' internal temperature be closely monitored and (2) the condition that all exercise be done at the discretion and under the direct observation of a medical professional. In particular, Towson

25

University contends that these proposed accommodations (1) would impose undue financial and administrative burdens; (2) would not effectively reduce Class' risk of heatstroke; and (3) would require fundamental changes in the nature of the football program. The relevant cases indeed note that an accommodation is unreasonable if it "imposes undue financial and administrative burdens," Halpern, 669 F.3d at 464 (quoting Arline, 408 U.S. at 287 n.17); or if there is a high likelihood that the accommodation would not effectively allow the disabled individual to meet the eligibility requirements, Halpern, 669 F.3d at 465 (holding that "the indefinite duration and uncertain likelihood of success of [plaintiff's] proposed accommodation renders it unreasonable"); or if it "requires 'a fundamental alteration in the nature of [the] program,'" Arline, 480 U.S. at 287 n.17 (alteration in original) (quoting Southeastern Cmty. Coll., 442 U.S. at 410 (explaining that an accommodation whereby a nursing student would take only academic classes and no clinical courses would fundamentally alter the nurse training program)).

Towson University's contention that the requested accommodations would impose an undue financial and administrative burden is not well developed in the record, although the University did present evidence that its football trainers are not qualified to implement the CorTemp temperature

26

monitoring system, suggesting that Class' proposed accommodation would require the expense of training them and even hiring additional personnel. Moreover, as a matter of possible administrative burden, we have difficulty understanding how the temperature monitoring system Class proposed could function in the context of a football game, particularly for a starting offensive lineman, such as Class. During football games, athletic trainers, such as the trainer who would be designated to monitor Class every 5 to 10 minutes under his proposed accommodations, are not allowed to participate in football huddles unless a timeout has been called. Moreover, portions of football games are often played without huddles, and offensive drives routinely take more than 5 to 10 minutes on a real-time clock. Indeed, they often take more than 5 to 10 minutes on a game clock. And, if a reading indicated an at-risk internal body temperature, Class would have to be removed from the game for an indefinite period of time sufficient to let him cool down. The coach would be denied his starting offensive guard and Class would be denied his wish to play. Nonetheless, we cannot conclude on this sparse record that the district court erred in rejecting Towson University's challenge on the ground that the accommodation would impose undue financial and administrative burdens.

27

But Towson University's contention that the requested accommodations are not reasonable because they (1) would not effectively satisfy Towson University's safety concerns and (2) would require fundamental changes in the nature of its football program has merit. We address each reason in order.

A

On the issue of whether the requested accommodations would effectively eliminate the risk of a second catastrophic heatstroke, Dr. Kindschi concluded that Class' full participation in the football program, even with the proposed accommodations, would unacceptably expose him to the risk of another heatstroke that could be fatal. It is not our role to agree or disagree with Dr. Kindschi's opinion or to weigh whether her evaluation is more persuasive than another doctor's. Rather, we are to determine whether her professional judgment was supported by the record. We conclude that it was.

First, Class himself claims that he suffers from an "inability to regulate his body temperature and susceptibility to heat stroke." Similarly, the district court found that "the evidence at trial indicated that Class may be at <u>an increased risk</u> of a reoccurrence of heat stroke as a result of his original injury." (Emphasis added).

28

Second, the Korey Stringer Institute's test reports indicate that the heatstroke risk really has not been demonstrably abated. The first report shows that Class failed to thermoregulate adequately during a "low intensity" heat tolerance test. The second and third reports show that he passed, although he did so with several substantial caveats and conditions related to his inability to thermoregulate sufficiently. His second test was another "low intensity" test, and Class' performance prompted the Institute to recommend that Class limit any high intensity exercise (including football) to "cool environments." It "strongly suggest[ed]" that Class undergo a third test before engaging in "intense conditioning that is done in a warm to hot environment." In his third and final test, which was of "moderate intensity," Class was able to perform for only 50 minutes of the scheduled 60-minute test. The Institute reported that Class had "made sizeable gains," but that it was important that, while engaging in any intense exercise, he be directly supervised by a "medical professional" and have his internal temperature closely monitored.

Third, all of the Korey Stringer Institute tests were conducted while Class was wearing shorts and a "light T-shirt" and not while wearing standard football gear, including a uniform, football pads, and a helmet, and the specialized protective padding required to protect his liver. Dr. Casa, the

29

Director of the Institute, conceded that test conditions did not replicate football conditions. And he also conceded that the relative humidity under which the tests were conducted did not replicate Baltimore's average humidity in August -- the tests were conducted in 40% humidity while Baltimore's average August humidity was shown to be around 70%.

Fourth, Class' August 2013 heatstroke left him with a compromised physical condition, including a thinner abdominal wall, an ongoing requirement to take medications, and an increased susceptibility to a future fatal heatstroke. Relying on Class' medical records, Dr. Kindschi described the medical reasons for Class' compromised condition:

> His initial heatstroke was nearly fatal. He had multi-organ failure and dysfunction which led to fulminant necrosis of his liver, requiring transplant. He had a very complicated postoperative course that included multiple surgeries for wound dehiscences and infections. He had kidney failure that required intervention. He had a hemothorax. He had persistently elevated liver enzymes after discharge. And he had post-transplant lymphoproliferative disease which required chemotherapy.

She concluded by stating that Class' prior heatstroke was "a risk factor for future heat illness," a conclusion that was not disputed and that the district court found.

On this record, it is clear that Dr. Kindschi's judgment that Class could not play football without the risk of serious injury or death was well supported. That conclusion leaves only

30

the question of whether Dr. Kindschi's opinion that the temperature monitoring accommodation would not sufficiently reduce this risk was reasonable.

Dr. Kindschi considered the proposed accommodation to monitor Class' internal body temperature throughout his football activity and concluded that it would not adequately meet the needs of health and safety. She explained that she had concerns "about the reliability of where the [electronic heat] sensor [was] in the GI system," noting that digestion is "a fairly individualized and even day-to-day process." She explained that such unreliability would be compounded by the difficulty "of figur[ing] out two-a-day practices with one CorTemp sensor." She stated that she would not feel comfortable having Towson University's trainers monitor Class' internal temperature without a physician present, stating that such a role was "beyond their scope." And she concluded that the monitoring program, even if well implemented, would not eliminate the "meaningful risk of catastrophic reinjury." Dr. Kindschi stated that, in making her decision, she had considered the serious risk of injury or death in the context of the potential problems in administering the monitoring system, conceding that the decision was "very difficult" and was made only after "considerable thought."

31

Dr. Kindschi's concerns were supported by Dr. Casa's testimony, which explained in detail how the monitoring system would be carried out. After explaining that Class' internal body temperature would be monitored by an electronic sensor that Class ingested, emitting a low-level electronic signal from his intestinal tract, he described how a monitor would have to be placed near Class to receive the signal and obtain the readings. The person holding the monitor would have to hold it near Class for 3 to 5 seconds every 5 to 10 minutes, requiring either that the person holding the monitor go onto the football field into the huddle or that Class go to the sidelines. As Dr. Casa explained:

> So just during normal, when he's flipping out of certain drills, you know, if he's rotating around, a manager can be sitting there where the person's holding the water bottles; and he could check him as people rotate through. If there's specific, you know, designated rest breaks, then obviously someone can just come behind him.

Dr. Casa also testified to caveats that reiterated Dr. Kindschi's concerns. As he testified:

> Now, there are a few caveats. You have to ingest [the electronic sensor] a certain number of hours beforehand so that it's out of the stomach and into the intestines to allow for more accurate measures. You obviously have to have a new pill when the other pill has been passed. You have to have the receiver and a small amount of training to make sure you can utilize the device.

* * *

32

You'd probably have a manager or someone assigned to checking the temperature every time there's a break or every time it's convenient, every five or ten minutes, and then the specific instructions from the athletic trainer that every time a measure is taken, that is communicated to the athletic trainer. . . . I mean my particular recommendations would be if they reached 103[°F] I would give them a break, use particular body-cooling strategies and use hydration. And then when it went back down under 102[°F], I would let 'em return to activity.

Finally, and perhaps most importantly, the internal temperature monitoring could not ensure that Class would not suffer from another heatstroke while playing or practicing. The monitoring would only facilitate the discretionary decision of whether it was necessary to remove him from the game or practice. This would not guarantee that his removal would, in fact, be sufficiently early. In any event, removing him from the activity would deny Class the very participation that he seeks by the accommodation. He could not play as the coach might need if playing were to raise his internal temperature to a dangerous level, which itself would be an individualized threshold, would not be known with any certainty, and would be predicted only as a discretionary medical judgment that could prove to be wrong.

On this record, Class' claim that Dr. Kindschi's decision had no medical support is simply untenable. While he may disagree with her judgment, even his expert's testimony purporting to support his return, at least to football

33

"practice," was filled with serious caveats and precautions. And no one disputed that the monitoring effort would be conducted against the continuous and heightened risk of heatstroke and the reality that numerous athletes had died or suffered serious injury from it -- including Class himself. Indeed, Dr. Casa conceded that over a recent 9-year period, 29 athletes had died from heatstroke in the United States.

As noted, the standard for assessing Dr. Kindschi's judgment not to clear Class for return to football under Towson University's Return-to-Play Policy is not whether we share that judgment or whether she had a better judgment than some other doctor. Rather, the standard is whether her judgment was reasonable -- i.e., whether it was individualized to Class, was reasonably made, and was based on competent medical evidence. When applying that standard, we conclude that Dr. Kindschi's decision was supported by legitimate health and safety concerns, manifested by the medical records, which were not eliminated by the proposed monitoring system. Therefore, we conclude that her decision was not unreasonable.

Courts are "particularly ill-equipped" to evaluate the medical ineffectiveness of proposed accommodations in safeguarding against significant health risks. Davis, 263 F.3d at 102 (quoting Bd. of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 92 (1978)) (explaining that courts generally accord

34

deference to a school's judgment regarding admissions qualifications). In this case, the district court did not show deference to Towson University but engaged in its own evaluation of the effectiveness of the proposed accommodations. In doing so, it applied the wrong standard and analysis. See Halpern, 669 F.3d 463 (noting that courts are "at a comparative disadvantage in determining" technical eligibility standards); Knapp, 101 F.3d at 485 (explaining that "it will be the rare case regarding participation in athletics where a court may substitute its judgment for that of the school's team physicians"); Doe, 50 F.3d at 1266 (explaining that the court was "reluctant" to "substitute [its] judgment for that of [the university]," despite potentially conflicting recommendations from the Centers for Disease Control and Prevention). At bottom, we agree with the Seventh Circuit's articulation in Knapp regarding the courts' role in such issues. As the Knapp court stated:

> On the same facts, another team physician at another university, reviewing the same medical history, physical evaluation, and medical recommendations, might reasonably decide that [Class] met the physical qualifications for playing on an intercollegiate [football] team. Simply put, all universities need not evaluate risk the same way. What we say in this case is that if substantial evidence supports the decision-maker . . . that decision must be respected.

101 F.3d at 485.

35

While it is sufficient in evaluating the reasonableness of a proposed accommodation to rely on only one factor, Towson University also contends that the temperature monitoring and medical supervision proposed by Class would fundamentally alter the nature of its football program. We agree.

Class' proposed accommodations would require Towson University's Team Physician to allow Class to play football and supervise his participation when, in her medical judgment, she has concluded that he should not be playing football under the circumstances. The relevant accommodation, as stated by the Korey Stringer Institute's report, requires that "[a]ll exercise progression should be done <u>at the discretion and direct observation</u> of a medical professional." (Emphasis added). Yet it would not be possible to implement such an accommodation without upending the critical role of the Team Physician and her subordinates and impinging on the ongoing professional medical discretion she is retained to exercise. Because the Team Physician's role is an "essential aspect" of the football program for many of the same reasons the University's health-and-safety clearance requirement is an essential eligibility requirement, Class' proposed modification would constitute a fundamental alteration in the nature of the program. <u>See</u> <u>Halpern</u>, 669 F.3d at 464 (citing <u>PGA Tour, Inc. v. Martin</u>, 532

U.S. 661, 682-83 (2001) (examining a rule's purpose and importance to the program to determine if it is an essential aspect, such that a change to the rule would fundamentally alter the program)).

For these reasons, we find that the Team Physician's judgment and, derivatively, Towson University's judgment to reject Class' proposed accommodations were not unreasonable in the context of the risks.

IV

Gavin Class is a courageous man of substantial character, which is much to be admired. He understandably has been seeking to validate his determination and perseverance to return to intercollegiate football and "to become the first person to come back from exertional heatstroke and a liver transplant to play football." While we hold that Towson University acted reasonably in response to the health risks posed by Class' full participation in its football program, we nonetheless believe that Class has achieved a substantial victory with his accomplishments. He can be proud to tell his story.

<u>REVERSED</u>

37

WYNN, Circuit Judge, concurring in part and dissenting in part:

Towson University ("Towson") decided that Gavin Class, a student who had suffered a serious heatstroke, could no longer safely participate in its Division I football program. Class challenged this decision under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. The key question we must answer is what level of deference the district court should have applied in evaluating whether Towson discriminated against Class on account of his alleged disability.

The majority opinion and I agree that the district court applied the wrong standard in evaluating Towson's decision. The Team Physician's medical determination that Class faced too great a risk of serious injury or death to fully participate in Towson's football program was entitled to some deference. We all agree that the district court should have reviewed Dr. Kindschi's opinion to determine if it was individualized, reasonably made, and based upon competent medical evidence. In my view, however, the touchstone of this inquiry should be the objective reasonableness of the university's decision—not the subjective good faith of the Team Physician, as the majority opinion suggests.

Further, I cannot support applying the appropriate standard for the first time here on appeal. Instead, the proper course of action is to remand the case, so that the district court may

38

make factual findings in accordance with the correct standard of deference. Therefore, I respectfully concur in part and dissent in part.

I.

At the heart of this case is the appropriate level of deference that we should accord to Towson's decision that Class could no longer safely participate in its football program. I thus address that issue first.

Class's claims arise under two similar provisions of law: the ADA and the Rehabilitation Act. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act imposes the same prohibition on "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).[1]

Under the ADA, a disabled person is otherwise qualified to participate in a program if he is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential

---

[1] As the majority opinion notes, the ADA and the Rehabilitation Act are essentially the same in all aspects relevant to this opinion. See ante, at 15 n.2. Accordingly, for the sake of simplicity, I refer solely to the ADA in some portions of this opinion.

eligibility requirements for . . . participation in" that program. 42 U.S.C. § 12131(2); see 45 C.F.R. § 84.3(l)(3), (4) (stating a nearly identical standard applicable to Rehabilitation Act claims).

In my view, the essential eligibility requirement at issue here is the ability to play football without an unacceptable risk to the player's health and safety. See Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995) ("[A]n individual is not otherwise qualified if he poses a significant risk to the health or safety of others."). I therefore disagree with the majority opinion's conclusion that "Towson University's requirement that a student-athlete obtain the Team Physician's clearance before returning from injury is legitimately an essential eligibility requirement." Ante, at 23. It is inconsistent with the ADA to elevate the unilateral approval of the entity accused of discrimination to the status of an essential eligibility requirement, as the majority opinion does here.[2] Dr. Kindschi determined whether Class met the pertinent essential eligibility requirement—Class's ability to play

---

[2] For example, in Halpern v. Wake Forest University Health Sciences, 669 F.3d 454, 463 (4th Cir. 2012), the Court found that professionalism was an essential eligibility requirement for participation in a medical school program. The Court, however, did not frame the eligibility requirement as the medical school's decision that a student was professional, but instead looked to whether the student in fact possessed that trait.

40

football without an unacceptable risk to his health and safety; her determination itself was not the essential eligibility requirement.[3]

With the appropriate essential eligibility requirement in mind, I turn to the standard that the district court should have applied in evaluating Dr. Kindschi's opinion. My review of the relevant ADA and Rehabilitation Act case law convinces me that Dr. Kindschi's opinion should have been reviewed for objective reasonableness, in contrast to the majority opinion's more subjective approach.

The majority opinion relies heavily on Halpern, in which a student with Attention Deficit Hyperactivity Disorder and an anxiety disorder challenged his medical school's decision to dismiss him from the school for repeatedly exhibiting unprofessional behavior. 669 F.3d at 456–57. In that case, this Court afforded "great respect" to the school's "professional judgments" regarding the student's qualifications to continue in the Doctor of Medicine program. Id. at 463. In doing so, we noted that in the due process context, "the Supreme

_____

[3] In fact, the majority opinion's own analysis betrays its claim that Dr. Kindschi's approval was an essential requirement for the program. Class admitted that Towson did not grant him clearance to play. This admission alone would defeat his claim if the clearance decision itself was an essential eligibility requirement, as the majority opinion purports. The majority opinion, however, did not end its analysis there—perhaps realizing that such a circular requirement does not comport with the ADA.

41

Court has held that a court should defer to a school's professional judgment regarding a student's academic or professional qualifications." Id. at 462–63 (citing Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985), and Bd. of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 92 (1978)). This deference was warranted "because courts are particularly ill-equipped to evaluate academic performance." Id. at 463 (quoting Davis v. Univ. of N.C., 263 F.3d 95, 102 (4th Cir. 2001)); see also Horowitz, 435 U.S. at 92.

The majority opinion cited Halpern throughout its opinion, without recognizing that Halpern is readily distinguishable from this case. Halpern involved a determination of academic qualifications, which is different in kind from a determination of physical qualifications. Academic eligibility is not determined through science, but through individual judgments that necessarily involve some level of subjectivity and discretion. See Ewing, 474 U.S. at 225 n.11; Horowitz, 435 U.S. at 90. Academic eligibility decisions are "not readily adapted to the procedural tools of judicial or administrative decisionmaking" because there are few objective standards for the courts to apply. Horowitz, 435 U.S. at 90. In contrast, courts can assess medical determinations with an objective test that looks to the medical facts supporting the entity's

42

decision.  See Sch. Bd. of Nassau Cty. v. Arline, 480 U.S. 273, 288 (1987); Doe, 50 F.3d at 1265.

In Arline, for instance, the Supreme Court considered whether a public school violated Section 504 of the Rehabilitation Act—one of the same provisions relied upon by Class—when it discharged a teacher who suffered from tuberculosis.  480 U.S. at 275–76.  The Court held that to determine whether the teacher posed a significant risk to the health and safety of others, the district court must make

> [findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk . . . , (b) the duration of the risk . . . , (c) the severity of the risk . . . and (d) the probabilities the disease will be transmitted.

Id. at 288 (alteration in original).  Such an inquiry is essential to the Rehabilitation Act's "goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear."  Id. at 287.

Three years after the Supreme Court decided Arline, Congress passed the ADA, which expressly provides that an employer can decide that a disabled individual is unqualified if he or she "pose[s] a direct threat to the health or safety of other individuals in the workplace."  Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 103(b), 104 Stat. 327, 334 (1990) (codified as amended at 42 U.S.C. §

43

12113(b)). Congress has incorporated similar "direct threat" provisions in other sections of the ADA and in the Rehabilitation Act. See 42 U.S.C. § 12182(b)(3) (applying to places of public accommodation under Title III of the ADA); 29 U.S.C. § 705(20)(D) (excluding those who "constitute a direct threat to the health or safety of other individuals" from the definition of "individual with a disability" under the Rehabilitation Act).

In a case arising out of the direct threat provision of Title III of the ADA, Bragdon v. Abbott, 524 U.S. 624 (1998), a dentist refused to provide his standard services to a patient because she was infected with the human immunodeficiency virus. Id. at 628–29. The Supreme Court considered whether it owed deference to the dentist's determination that the patient posed a direct threat to his health and safety, particularly in light of the fact that he was a health care professional. Id. at 648. The Supreme Court held that it "should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments." Id. at 650 (emphasis added). The Court explained:

> As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability.

44

Id. at 649 (emphasis added).

In the employment context, a similar standard applies when an employer decides whether a disabled employee poses a direct threat to his or her own health and safety. See 29 C.F.R. § 1630.2(r). In such cases, the employer must perform an individualized assessment of the employee's ability to safely perform the job, "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." Id.; see also Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 86 (2002) (applying this standard). Several employment cases have reviewed medical determinations for "objective reasonableness," just as the Supreme Court did in Bragdon. See, e.g., Rodriguez v. ConAgra Grocery Prods. Co., 436 F.3d 468, 484 (5th Cir. 2006); Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 31–32 (1st Cir. 2002); Holiday v. City of Chattanooga, 206 F.3d 637, 645 (6th Cir. 2000).

The Seventh Circuit applied a similar objective evidence standard in Knapp v. Northwestern University, 101 F.3d 473, 485–86 (7th Cir. 1996), a case on all fours with this one. In Knapp, the Seventh Circuit considered whether Northwestern University violated the Rehabilitation Act by banning a student from playing varsity basketball because he had a potentially fatal heart defect. Id. at 476. The Seventh Circuit held that

45

"medical determinations of this sort are best left to team doctors and universities as long as they are made with reason and rationality and with full regard to possible and reasonable accommodations." Id. at 484. The court explained that in cases of this nature, "the court's place is to ensure that the exclusion or disqualification of an individual was individualized, reasonably made, and based upon competent medical evidence." Id. at 485.

Notably, Northwestern University's determination did not need to be "the right decision" or the only reasonable conclusion. Id. Indeed, physicians might reasonably reach different medical conclusions, and "all universities need not evaluate risk the same way." Id. The Seventh Circuit simply ensured that the university's opinion was "based on objective evidence," id. at 486, with an eye to the Arline factors regarding determinations made in medical risk cases, id. at 485 (quoting Arline, 480 U.S. at 287–88).[4]

The Knapp court adopted the correct approach to eligibility decisions in university athletics. The majority opinion purports to adopt the Knapp standard, and to the extent that it does, I concur. However, the majority opinion underemphasizes the need for such decisions to be based on objective evidence

---

[4] Knapp was decided before Bragdon and thus did not rely upon Bragdon's objective reasonableness language.

and supported by competent medical knowledge. Id. at 486; see also Bragdon, 524 U.S. at 649-50. The majority opinion instead considers whether Towson's decision not to allow Class to play football "was a good-faith application" of Towson's Return-to-Play policy, which implies that the subjective intent of the Team Physician is a key factor. Ante, at 25. But just as the Supreme Court made clear in Bragdon, subjective good faith will not relieve Towson of liability if its decision was not objectively reasonable. 524 U.S. at 649-50. Following the guidance of the cases interpreting the direct threat provisions, we should take a rigorous look at the medical basis and objective reasonableness of Towson's decision, in light of then-current medical knowledge. See Echazabal, 536 U.S. at 86; Bragdon, 524 U.S. at 649; Arline, 480 U.S. at 288.

Having an objective standard is particularly important to avoid the paternalism toward disabled individuals that the ADA is intended to combat. 42 U.S.C. § 12101(a)(5) ("[I]ndividuals with disabilities continually encounter various forms of discrimination, including . . . overprotective rules and policies."); Echazabal, 536 U.S. at 85 ("Congress had paternalism in its sights when it passed the ADA."). Paternalism is particularly likely to emerge in questions involving the health and safety of disabled individuals. While universities might subjectively mean well when they find that it

47

is too risky for a disabled person to participate in athletics, that good-faith intention could mask paternalism and stereotypes about those with disabilities. As stated in Knapp, the law "prohibits authorities from deciding without significant medical support that certain activities are too risky for a disabled person. Decisions of this sort cannot rest on paternalistic concerns." 101 F.3d at 485–86.

In sum, I agree with the majority opinion that Towson's decision should be accorded deference, as long as its conclusion was reasonable, individualized, based on competent medical knowledge, and consistent with Towson's statutory duty to make reasonable accommodations for disabled students. Such a review requires the court to take a close look at the objective medical evidence supporting the university's views, and not just the good-faith intention of the university medical staff. Deference in this context is emphatically not a rubber stamp, but rather a willingness to respect the university's judgment if it is medically and objectively reasonable.

## II.

The majority opinion correctly concludes that the district court failed to apply the correct standard. Instead of assessing Dr. Kindschi's opinion for objective reasonableness, the district court weighed the testimony of Dr. Kindschi against the testimony of Drs. Casa and Hutson, and found Class's experts

to be more "persuasive." Class v. Towson Univ., No. RDB-15-1544, 2015 WL 4423501, at *8 (D. Md. July 17, 2015). In substituting Towson's judgment with its own, the district court erred. The majority opinion chose to apply the deferential standard to this case, for the first time, on appeal. I, on the other hand, would remand the case to the district court.

When the district court applies the wrong legal standard, the best course is generally to remand the case and allow "the trier of fact to re-examine the record in light of the proper legal standard." Kelley v. S. Pac. Co., 419 U.S. 318, 332 (1974); see also Humphrey v. Humphrey, 434 F.3d 243, 247 (4th Cir. 2006). Only when "the record permits only one resolution of the factual issue" is remand unnecessary. Pullman-Standard v. Swint, 456 U.S. 273, 292 (1982); see also Humphrey, 434 F.3d at 248 (providing as an example that "an appellate court may resolve the case without remanding if the evidence would inevitably produce the same outcome under the correct standard"). When this case is viewed in its entirety, the record does not compel a conclusion either way regarding whether Dr. Kindschi's decision was individualized, reasonably made, and based upon competent medical evidence. Remand is, thus, the appropriate route to take.

In holding otherwise, the majority opinion bends key aspects of the factual record. Two particular mischaracterizations illustrate my concern.

First, the majority opinion mischaracterizes the results of heat-tolerance testing conducted by the Korey Stringer Institute ("Institute"). The majority opinion concludes that the Institute's "test reports indicate that the heatstroke risk really has not been demonstrably abated" and cites the test results as support for Dr. Kindschi's decision not to allow Class to return to Towson's football program. Ante, at 29. However, Dr. Casa, the head of the Institute and a leading expert in heatstroke, looked at these same test results and found that Class's performance was "stellar" and "better than almost any athlete [he] would even pull off the streets." J.A. 302. Relying upon the test results, Dr. Casa concluded that "without question" it was reasonably safe for Class to participate in Towson's football program. J.A. 297.

Towson sought out the Institute to measure Class's ability to thermoregulate, and Towson paid for the three tests that the Institute conducted. The third test, performed in June 2015, was the key test for assessing Class's ability to return to football, since the Institute designed the test to "mimic [the] intensity of what would happen during a football practice" in a hot environment. J.A. 302. By calculating the typical exertion

of a collegiate lineman during a preseason practice, the Institute determined that Class would successfully complete the test by running 1.6 miles in nineteen minutes. If Class wished to do more than this, the test would continue for "up to a 1 hour duration." J.A. 600. Class decisively passed this test and "did demonstrate the ability to thermoregulate." J.A. 601. In fact, he was able to run 4.25 miles in fifty minutes, meaning he completed "2.7 times (265%) the estimated workload necessary for the defined passing requirements." J.A. 601. The only reason Class did not complete sixty minutes of exercise was muscle fatigue, not a failure to thermoregulate. Nonetheless, in summarizing the results of this test, the majority opinion simply states that "Class was able to perform for only 50 minutes of the scheduled 60-minute test." Ante, at 29. This implies that Class failed the test—which he did not—and that he failed because he could not thermoregulate—which is untrue.

Second, the majority opinion mischaracterizes the record to create factual support for Dr. Kindschi's conclusion that the CorTemp system could not prevent Class from suffering another heatstroke. Under the standard we adopt today, Dr. Kindschi's conclusion must be supported by "competent medical evidence." Ante, at 24 (quoting Knapp, 101 F.3d at 485). Dr. Kindschi pointed to no literature supporting her medical conclusions, including her claim that a player could still overheat while the

51

CorTemp system was in use. In fact, Dr. Casa testified that a player's internal temperature could only go up by about one degree in a five to ten minute period, and Class could be removed from play and cooled down before reaching temperatures that are "anywhere near a heatstroke." J.A. 311. Dr. Casa recommended that Class be cooled down if he reached an internal temperature of 103 degrees Fahrenheit, but noted that this threshold was very conservative. Dr. Kindschi did not point to any medical evidence supporting her decision to completely discount the conclusion of Dr. Casa, a leading heat-illness expert.

The majority opinion also notes that dozens of athletes have died from heatstroke, and cites this fact as support for Dr. Kindschi's conclusion that Class would not be safe. Ante, at 34. However, there is no evidence in the record that anyone has ever suffered heatstroke while being monitored with the CorTemp system, which is used by numerous universities and NFL teams. As Dr. Casa testified: "[i]f he's using the system, actually, [Class] would be the safest person on the football field because he's the one person who then could not overheat during practice." J.A. 310. Without any medical evidence supporting her opinion, the record does not compel the conclusion that Dr. Kindschi's opinion on the effectiveness of the CorTemp system was objectively reasonable.

52

In pointing out the majority opinion's mischaracterizations of the record, I do not mean to suggest that Dr. Kindschi's opinion was not objectively reasonable. Perhaps it was. I merely underscore that the record is less clear than the majority opinion portrays and does not compel the conclusion that Dr. Kindschi's determination should be upheld. Therefore, the proper remedy is to vacate and remand this case to the district court for consideration of whether Dr. Kindschi's decision was individualized, objectively reasonable, and supported by competent medical evidence.

### III.

In sum, the majority opinion aptly recognizes that Gavin Class is "a courageous man of substantial character, which is much to be admired." Ante, at 37. And I agree with the majority opinion that the district court failed to apply the proper standard when assessing Dr. Kindschi's decision.

But the majority opinion places too great an emphasis on Dr. Kindschi's subjective intent, and not enough emphasis on the objective reasonableness of her medical opinion. And, the majority opinion makes its own factual findings instead of remanding to allow the district court to make factual findings under the correct standard in the first instance. For those reasons, I believe Gavin Class is entitled to more than being

"proud to tell his story."  <u>Ante</u>, at 37.  Accordingly, I respectfully concur in part and dissent in part.